[No. C050066. Third Dist. Apr. 17, 2007.]

COUNTY OF AMADOR et al., Plaintiffs and Respondents, v.
CITY OF PLYMOUTH et al., Defendants;
IONE BAND OF MIWOK INDIANS, Intervener and Appellant.

COUNSEL

Holland & Knight, Paul C. Workman, Zehava Zevit and Amanda J. Monchamp for Intervener and Appellant.

John F. Hahn, County Counsel, Martha Jeanne Shaver, Assistant County Counsel, Gregory Gillott, Deputy County Counsel; Nielsen, Merksamer, Parrinello, Mueller & Naylor and James R. Parrinello for Plaintiffs and Respondents County of Amador and Amador County Board of Supervisors.

McDonough Holland & Allen, Stacey N. Sheston and Kara K. Ueda for Plaintiffs and Respondents No Casino in Plymouth, Jon Colburn and Dueward W. Cranford II.

OPINION

**BLEASE, Acting P. J.**—This is an appeal from a judgment granting a peremptory writ of mandate invalidating a municipal services agreement (MSA) between the Ione Band of Miwok Indians (the Tribe) and the City of Plymouth (the City) on the ground the City entered the agreement without complying with the California Environmental Quality Act (CEQA). (Pub. Resources Code, § 21000 et seq.)[1]

The City is a small town located in the County of Amador (the county). The Tribe states it is a federally recognized Indian tribe. It has options to

---

[1] References to an undesignated section are to the Public Resources Code.

purchase 228 acres of land located in or adjacent to the City and has applied to the United States Secretary of the Interior (the Secretary) to take the land in trust for use by the Tribe. The Tribe intends to build a 120,000 square foot "world-class Gaming Facility" (Gaming Development) on the land, comprised of a hotel, restaurants, and night clubs or bars. The casino building is to be located within the city limits and, if constructed, will be the third casino approved for operation within the county.

The city council voted to support the application of the Tribe to place the lands in trust, conditioned upon the adoption of the MSA, and sent a letter of support to the Secretary. The letter is incorporated in the MSA and is the sole consideration for the Tribe's agreement. The MSA is an enforceable agreement under which the City supports the trust application of the Tribe in return for millions of dollars to "comprehensively" mitigate the impacts of the casino development and to compensate the City "for municipal services and other public services [it would] provide[] on the Trust Lands . . . ."

The MSA unconditionally obligates the City to vacate a portion of a city road to provide access to the casino hotel and to remodel the existing fire station. It conditionally obligates the City to construct connections to the casino's sewer and water systems and to increase their capacities to meet the needs of the Gaming Development.

The county and individual parties[2] obtained a writ of mandate that ordered the City to set aside the resolution approving the MSA and enjoined its implementation as a project subject to CEQA. The City filed a timely appeal of the judgment. When the City abandoned its appeal, presumably because the city council members who supported the MSA were recalled, the Tribe intervened and filed a notice of appeal. The Tribe is the only appellant.

The Tribe argues that the MSA is not a project subject to CEQA because the City lacks authority to approve the Tribe's Gaming Development, because the Tribe could develop the municipal services without the City, and because the MSA does not constitute an approval by the City of its provision of municipal services or vacation of the City road. We disagree.

The Tribe has miscast the project as the acquisition of the trust lands and the Gaming Development. Although neither the taking of lands in trust nor the Gaming Development requires the formal approval of the City, the City's construction of public works and the vacation of a City road to the casino

---

[2] We shall refer to plaintiffs collectively as the County.

hotel do require its approval. It is these activities that constitute a project within the scope of CEQA, and the MSA that constitutes an approval of the project. (Cal. Code Regs., tit. 14, § 15352, subd. (a); hereafter Guidelines.)

█ The purpose of CEQA is to require a public entity to consider the environmental consequences of a project before it is approved. The City cannot evade this responsibility by a contract that commits the City to a course of action that would involve the very activities that require an environmental analysis before their approval. The City project includes public works and a road transfer and other activities that are subject to CEQA because they may cause either a direct physical change in the environment or a reasonably foreseeable indirect physical change in the environment.

Section 21168.9 provides that if any "decision of a public agency has been made without compliance with [CEQA], the court shall enter an order . . . [¶] . . . [that the] decision be voided by the public agency." Accordingly, the decision of the City to enter into the MSA without complying with CEQA is void. For this reason the MSA and its support of the trust application of the Tribe is invalid.

We will affirm the judgment granting the writ of mandate and enjoining the implementation of the MSA.

## FACTUAL AND PROCEDURAL BACKGROUND

The City is a small town located in the county.[3] The Tribe is the Ione Band of Miwok Indians. It claims historical occupation of Amador County, including the City and surrounding lands, and that it is a federally recognized Indian tribe. The Tribe has options to purchase 228 acres of land inside or adjacent to the City, and has applied to the Secretary to convert the land when acquired to trust status for the Tribe.

The Secretary is authorized to acquire lands in trust "for the purpose of providing land for Indians." (25 U.S.C. § 465.) Title to lands so acquired is "taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired," and is "exempt from State and local taxation." (*Ibid.*)

---

[3] In the year 2000 the City had a population of 980 and covered an area of less than one square mile. (<http://factfinder.census.gov/servlet/GCTTABLE?_bm=y&-geo_id=04000Us06&-_box_head_nbr=GCT-PH1&-ds_name=DEC_2000_SF1_U&-_lang=en&-format=ST-7&-_sse=on> [as of Apr. 17, 2007].)

In the year 2000 the county had a population of 35,100 over an area of 593 square miles. (<http://quickfacts.census.gov/qfd/states/06/06005.html> [as of Apr. 17, 2007].)

The Tribe intends to develop the Gaming Development on the trust lands, consisting of a casino, hotel, restaurants, coffee shops, snack bars, night clubs or bars, and any other related uses. The authorization for gaming requires a compact between the Tribe and the state and a ratification of the compact by the Legislature. (25 U.S.C. § 2710(d)(1).)[4] Preliminary plans show a casino complex containing 120,000 square feet of building space, 65,000 square feet of which is devoted to the casino. The Tribe proposes to place the casino within the City limits. The other two casinos in the county are within 20 miles of the City.

Over substantial objection from the County and the residents of and around the City, the city council adopted a resolution approving the MSA and agreeing "to support the Tribe's request to have the Secretary take [the optioned lands] into trust for the benefit of the Tribe and the development of the Project on the Trust Lands." The City then sent a letter of support of the Tribe's trust application to the Secretary.[5] The council members voting for the resolution were subsequently recalled by the voters of the City.

The MSA expresses the Tribe's intent to acquire land in trust and to develop on it a "world-class Gaming Facility, hotel and other businesses." It recognizes the development will have both direct and indirect impacts on the City, including increased need for infrastructure, services, and criminal justice, as well as the removal of the trust land in the City from its tax rolls. To pay for these and other costs the Tribe agreed to pay the City $5.85 million in one-time fees and costs for the construction of infrastructure and over $3 million in annual subventions for maintenance and other purposes.

The City agreed to "an enforceable MSA to *comprehensively* mitigate *all* impacts of the [trust] acquisition by taking several steps, including, but not limited to: (a) providing economic incentives to enhance City programs and services; (b) mitigating any environmental impacts of its planned use of the Trust Lands that are identified in the EIS [environmental impact statement] to be conducted pursuant to NEPA [the National Environmental Protection Act]; [and] (c) compensating the City for municipal services and other public services to be provided on the Trust Lands, as provided by this MSA . . . ." (Italics added.)

In return, the City agreed to support the Tribe's request to the Secretary to approve a trust of the land for the benefit of the Tribe and the development of

---

[4] Class III gaming activities, as here, are lawful on Indian lands only if the activities are "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the state . . . ." (25 U.S.C. § 2710(d)(1)(C).)

[5] The letter states that it is based upon the "determin[ation]" that the [MSA] mitigates the potential adverse impacts that could be caused by the proposed development . . . ."

the land for a gaming facility. The only environmental review recognized by the MSA is a federal environmental review of the Gaming Development.

The MSA specifies several actions to be taken before the optioned lands are taken in trust. The Tribe agreed not to transfer title to the land to the United States "until the Department of the Interior has concluded any required environmental reviews of the Project under NEPA."[6] The City agreed that it would "commence and diligently pursue proceedings in order that the City shall vacate its rights to that portion of the loop road to the hotel that will be included in the Trust Lands simultaneously with the time the land is taken into trust." The City further must commit to provide municipal water and sewer collection services to the Gaming Development prior to the optioned lands being taken in trust by the Secretary.

The Tribe agreed to pay quarterly amounts to the City to perform services related to the Gaming Development including an "assessment of public infrastructure and needs analysis . . . review and analysis of requested municipal services to be provided to the Project . . . and other professional services as reasonably deemed necessary by the City to evaluate, process and support the Project." The Tribe also agreed to contribute $100,000 toward completion of the City's "Long Term Wastewater Management Plan" and the engineering work then in progress.

The Tribe agreed to pay for the increased law enforcement services required by the Gaming Development, including the costs of enforcement of state criminal laws on trust lands as authorized by Public Law 280. (Pub.L. No. 83-280 (Aug. 15, 1953) 67 Stat. 588.) To provide for fire protection and emergency services required by the Gaming Development, the Tribe agreed to pay the City $770,000 to remodel the existing fire station, quarterly payments for personnel to staff the fire station 24 hours a day, and annual payments for equipment, maintenance and apparatus. The station is to be fully operational on or before the date the Gaming Development is open to the public.

The City agreed to "provide to the Trust Lands the water and sewer collection services to the extent that the City provides or has committed to provide municipal water and sewer collection to these lands prior to the lands being taken into trust by the Secretary." The MSA provides that the City is

---

[6] Although "Project" is defined in the MSA to mean the development of a "world-class Gaming Facility, hotel and other businesses consistent with such development," as we have made clear the project for purposes of CEQA consists of the things which the MSA commits the City to construct.

obligated to provide water and sewer services when the Tribe provides specified connection fees. The connection fees become due "only if the City is willing and able to provide the municipal water and sewer disposal service sufficient to meet the needs of the Project . . . ."[7]

The parties agreed that the Tribe shall provide for its own water and sewer collection system to the Gaming Development except to the extent the City provides or has committed to provide water and sewer collection service prior to the lands being taken in trust. The Tribe agreed to payment of "connection fees" of $1.675 million for sewage hookup and $3 million for a water connection, conditioned on whether "the City is willing and able to provide the municipal water and sewage disposal service sufficient to meet the needs of the [Gaming Development] . . . ." However, the City also agreed it would not unreasonably withhold the approvals required to implement the sewage disposal and water supply provisions. In addition the Tribe agreed to pay annual sums of $500,000 each for the "operation and maintenance" of the sewer collection and the municipal water system.

Lastly, the City agreed to "commence and diligently pursue proceedings" to vacate its rights to a portion of the "loop road" that would provide access to the proposed hotel. The Tribe asserted the right to change ingress and egress to the trust lands "in accordance with applicable law."

The County petitioned the trial court for a writ of mandate to set aside the MSA on the ground the City failed to conduct an analysis and review of the MSA pursuant to CEQA before its approval. Plaintiffs No Casino in Plymouth, Jon Colburn, and Dueward Cranford II filed a separate petition for writ of mandate and complaint for injunctive and declaratory relief, which also alleged the City was required to comply with CEQA before adopting the MSA. The actions were consolidated.

The court issued a judgment that ordered the City to set aside its resolution approving the MSA and that enjoined its implementation. The City filed a timely appeal of the judgment. When the City abandoned its appeal the Tribe intervened and filed a notice of appeal.[8] The Tribe is the only appellant.

---

[7] The MSA further provides that the City shall provide connection to the City's existing sewer collection system and to obtain necessary easements for sewer infrastructure and to construct the connection to City infrastructure standards and to provide the Gaming Development with a water supply "sufficient to meet the needs of the" Gaming Development subject to the City obtaining an expansion of its water supply.

[8] We earlier denied the County's motion to dismiss the Tribe's appeal as untimely.

DISCUSSION

I

## The Project is the Subject of the MSA and Not the Gaming Development

The Tribe contends the MSA is not a project subject to CEQA because it is not a necessary step in the approval of Gaming Development. It claims the City's approval is not required for either the placing of the subject lands in trust or the development of the Gaming Development and that it will go forward regardless of the MSA.

The County claims the MSA constitutes the approval of a project because it obligates the City to send a letter of support for the Tribe's fee-to-trust application to the Secretary, obligates the City to reconstruct its fire station, obligates the City to extend its sewer and water services, and obligates the City to vacate portions of a City road. We agree with the County.

CEQA is a "comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' (*Friends of Mammoth v. Board of Supervisors* (1972) 8 Cal.3d 247, 259 [104 Cal.Rptr. 761, 502 P.2d 1049].)" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278].)

In furtherance of these goals, the term " '[p]roject' is given a broad interpretation in order to maximize protection of the environment" (*McQueen v. Board of Directors* (1988) 202 Cal.App.3d 1136, 1143 [249 Cal.Rptr. 439]) and the " 'agency [must] determine whether a project may have a significant environmental impact, and thus whether an EIR [environmental impact report] is required, *before* it approves that project.' " (*Laurel Heights Improvement Assn., supra*, 47 Cal.3d at p. 394; see also *Cadiz Land Co. v. Rail Cycle* (2000) 83 Cal.App.4th 74, 84 [99 Cal.Rptr.2d 378].)

As relevant here, a project is "[a]n activity directly undertaken by a[] public agency . . ." "which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the

environment." (Pub. Resources Code, § 21065, subd. (a.).)[9] The guidelines specify that a project refers to "the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies" but does not include "each separate governmental approval." (Guidelines, § 15378, subd. (c).) The CEQA Guidelines include within the term "project," "public works construction and related activities, clearing or grading of land [and] improvements to existing public structures . . . ." (Guidelines, § 15378, subd. (a)(1).)[10] The activities which the City agreed to undertake in the MSA include these kinds of activities.

The Tribe has miscast the project as the Gaming Development. Although neither the taking of the subject lands in trust nor the Gaming Development require the formal approval of the City, the City has agreed to improvements to existing public structures and other public works and to transfer an access road to the casino hotel subject only to conditions set forth in the MSA. The public works and road vacation constitute a project subject to CEQA and the MSA constitutes the approval or contingent approval of the project. That the Tribe could itself provide the municipal services required by the Gaming Development is irrelevant so long as the MSA is in effect.

Lastly, the portion of the City loop road that provides access to the casino hotel is not within the land to be purchased by the Tribe and would not be

---

[9] A "project" is defined in section 21065 as:

"[A]n activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following:

"(a) An activity directly undertaken by any public agency.

"(b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies."

The term "person" includes a city. (§ 21066.)

[10] The CEQA guidelines further define a "project" as:

"[T]he whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and that is any of the following:

"(1) An activity directly undertaken by any public agency including but not limited to public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof pursuant to Government Code Sections 65100–65700.

"(2) An activity undertaken by a person which is supported in whole or in part through public agency contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies.

"(3) An activity involving the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (Guidelines, § 15378, subd. (a).)

within any trust placed on land unless the City acted to vacate it. Accordingly, the City's approval is required for its inclusion within the trust lands and the Tribe could not accomplish this on its own.

The cases upon which the Tribe relies to show that the MSA is not a project are not analogous. They concern the lack of a causal relationship between the actions taken by a municipal entity and a project subject to CEQA that is not to be constructed by the entity.

In *Simi Valley Recreation & Park Dist. v. Local Agency Formation Com.* (1975) 51 Cal.App.3d 648 [124 Cal.Rptr. 635] (*Simi Valley*) the court concluded the detachment of property from a recreation and park district was not a project, in part because the detachment was not "necessary to the carrying out of some private project involving a physical change in the environment." (*Id.* at p. 664, italics omitted.) The court emphasized that development of the property in the detached area was not dependent on the detachment. (*Id.* at p. 665.) The detachment did not alone constitute a physical change in the environment subject to CEQA.

In *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464 [11 Cal.Rptr.2d 792] (*Kaufman & Broad*) the court held that the formation of a community facilities district (CFD) was not a project because there was no causal link between the formation of the CFD and the subject of the alleged environmental impact, the construction of new schools. (*Id.* at p. 474.) The court stated that the formation of the CFD would not create a need for new schools, and the construction of new schools was not entirely dependent upon the formation of the CFD. (*Id.* at p. 474.) The court concluded the only foreseeable impact from the formation of the CFD was that the school district would have funds available when it decided to acquire sites and construct new schools. (*Id.* at p. 474.)

This case differs from both *Simi Valley* and *Kaufman & Broad* because in neither of those cases was there a municipal project associated with the municipal action being taken. In *Simi Valley*, the detachment of the land from a recreation and park district would not make any change in the uses to which the land might be put. (*Simi Valley, supra*, 51 Cal.App.3d at p. 666.) In *Kaufman & Broad*, the formation of a CFD, "in no way commit[ted] [the school district] to any particular course of action . . . ." (*Kaufman & Broad, supra*, 9 Cal.App.4th at p. 471.)

Here, by contrast, there are distinct off-reservation actions that the MSA contemplates will be taken by the City that require the City's approval and which alone could produce a physical change in the environment subject to CEQA.

■ It is true that the "execution of an intergovernmental agreement between a tribe and a county or city government negotiated pursuant to the express authority of, or as expressly referenced in, an amended tribal-state gaming compact" is not subject to CEQA. (Gov. Code, § 12012.40, subd. (b)(1)(B); see also *id.*, § 12012.40, subd. (b)(1)(D).)

However, the MSA is not within these provisions because it has not been authorized or referenced in a compact and because no compact has been executed with the state. Until the lands are taken into trust no compact can be negotiated with the Governor on behalf of the state.[11] (25 U.S.C. § 2719(b)(1).) Because the MSA is not the product of a compact, it is not subject to an exception to CEQA.

The acquiring of trust lands for the Tribe is preliminary to the development of the casino project. The casino project is a class III gaming facility that must be operated in conformance with a compact between the Tribe and the State of California. (25 U.S.C. § 2710(d)(1)(C).) With two exceptions (Gov. Code, §§ 12012.30 & 12012.35),[12] all of the compacts ratified by the Legislature provide either: (1) that the execution of or "on-reservation" impacts of compliance with the terms of a compact do not constitute a project (Gov. Code, § 12012.25, subd. (g)); (2) that the execution of or compliance with the terms of the compact do not constitute a project (Gov. Code, § 12012.5, subd. (f)); or (3) that nothing in the compact, except the on-reservation impacts of compliance with the compact, shall exempt a city from the requirements of CEQA.[13] (Gov. Code, §§ 12012.40, subd. (b)(2), 12012.45, subd. (c)(2).)

No compact has as yet been negotiated between the state and the Tribe and for that reason the Legislature has not considered the extent to which the impacts of any casino project that might be the subject of a compact are exempt from CEQA. However, based upon the compacts that have been enacted with the state, the off-reservation impacts of a casino project would be subject to CEQA. That would certainly include, as here, any impacts that require the approval of the City.

It is also true that a project does not include "[t]he creation of government funding mechanisms or other government fiscal activities, which do not

[11] The Governor is the state officer authorized to negotiate and execute a tribal-state gaming compact with a federally recognized Indian tribe. (Gov. Code, § 12012.5, subd. (d).) The compact is approved when ratified by the Legislature. (*Id.*, subd. (c).)

[12] They simply ratify the subject compact without reference to CEQA.

[13] Government Code section 12012.40, subdivision (b)(2) reads as follows: "Except as expressly provided herein, nothing in this subdivision shall be construed to exempt a city . . . from the requirements of [CEQA]."

involve any commitment to any specific project which may result in a potentially significant physical impact on the environment."[14] (Guidelines, § 15378, subd. (b)(4).) However, the MSA does involve a commitment to a specific project, to wit, the provision of certain municipal services and the vacation of a City road.

## II

### The MSA Constitutes Approval by the City of its Provision of Municipal Services

■ To determine whether CEQA applies to a proposed governmental action, the threshold inquiry is whether the agency is contemplating an approval of an action, policy, undertaking, or private application for entitlement. (Remy et al., Guide to the Cal. Environmental Quality Act (11th ed. 2007) p. 69.)

The approval of a project is the decision by the agency committing it to a definite course of action with regard to a project to be carried out by a person or entity.[15] (Guidelines, § 15352, subd. (a).) The purpose of CEQA is to require the "public agency [to] explain the reasons for its actions to afford the public and other agencies a meaningful opportunity to participate in the environmental review process, and to hold it accountable for its actions." (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1426 [38 Cal.Rptr.3d 373].) Although CEQA does not guarantee that governmental decisions will favor the environment, it promotes informed decision-making. (*County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 944 [91 Cal.Rptr.2d 66].) If any "decision of a public agency has been made without compliance with [CEQA], the court shall enter an order . . . [¶] . . . [that the] decision be voided by the public agency." (§ 21168.9.)

The Tribe argues that the MSA does not constitute the approval of a project because it (a) does not commit the City to provide law enforcement services, (b) does not commit the City to provide fire or emergency services, (c) does not obligate the City to provide water and sewer services, (d) does not commit the City to provide waste disposal and (e) does not commit the City to do anything other than initiate a proceeding to vacate its rights in the loop road.

The Tribe also argues the City's letter of support for taking the optioned lands into trust cannot constitute an approval of a project because the letter is

---

[14] It is the services provided and not the money paid by the Tribe for the services, which are at issue.

[15] The term "person" includes a city or county. (Guidelines, § 15376.)

not a necessary step in the fee-to-trust or development process and there is no causal link between the MSA and any environmental impacts that may result from the Gaming Development, since those impacts will occur or not regardless of the MSA. For the following reasons we disagree with these contentions.

The Tribe has miscast the project that was approved by the MSA. It is not the Gaming Development, for the approval of that project, with the exception of the state's role in authorizing gambling pursuant to a compact, is confined to the federal government. Nor is the letter of support alone the measure of a project. A project involves "the whole of an action, which has a potential for resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment . . . ." (Guidelines, § 15378, subd. (a).) The whole of the action here is the MSA. As noted, it was entered by the City to "comprehensively mitigate" the environmental impacts of the Gaming Development including the compensation of the City "for municipal services and other public services to be provided on the Trust Lands, as provided by this MSA."

## A. *The Letter of Support*

The City's agreement to send a letter of support for the Gaming Development is an integral part of the MSA committing the City to a definite course of action with regard to provision of services and the vacation of a road in support of the Gaming Development. It is incorporated in the MSA by reference and constitutes the consideration for the Tribe's entry into the agreement.

The MSA further provides that the City is prepared "to support the Tribe's trust acquisition request . . . if the Tribe enters into an enforceable MSA to comprehensively mitigate all impacts of the acquisition . . . including . . . compensating the City for municipal services and other public services to be provided on the Trust Lands, as provided by this MSA . . . ."[16]

The MSA is an agreement that commits the City to a definite course of action with regard to the provision of municipal services for the Tribe's proposed Gaming Development and the vacation of the portion of a City road that would provide access to the casino hotel. (Guidelines, § 15352, subd. (a).) The inducement to carry out the course of action is the substantial payment that the Tribe agrees to provide to offset the costs of the services and the impact of the Gaming Development upon the City.

---

[16] The MSA states "the City is prepared to support the Tribe's trust acquisition request to the United States if the Tribe enters into an enforceable MSA" and "in consideration [of the letter of support for the Secretary to take the land into trust] the Tribe has offered to enter into an MSA with the City before any land goes into trust . . . ."

While the development of a gaming facility may not be legally dependent on the City's support in the form of a letter of approval, it is unrealistic to assert that the City's support has no consequences for the process being pursued by the Tribe. Page 2 of the MSA asserts that the letter of support is the consideration for the Tribe's entering into the MSA. The letter of support is the only consideration to the Tribe that is expressly set forth in the MSA as consideration for the agreement. The Tribe will potentially pay millions of dollars to the City under the MSA. We must assume the Tribe considered the letter of support to be a necessary component of the agreement.

B. *Vacation of Loop Road*

The MSA contains the following provision: "The Tribe shall acquire the Trust Lands subject to all existing City rights-of-way, easements and other valid existing rights, except that the City shall commence and diligently pursue proceedings in order that the City shall vacate its rights to that portion of the loop road to the hotel that will be included in the Trust Lands simultaneously with the time the land is taken into trust."

The portion of the loop road subject to the MSA apparently provides a vital transportation corridor over the optioned lands from the public highway to the casino hotel. Its vacation as a public right-of-way by the City is necessary for it to be included within the land to be taken in trust.

For this reason the MSA states that the vacating of the City's rights in the loop road to the hotel shall occur "simultaneously with the time the land is taken into trust." The manifest purpose of this timing is to impress the road with the trust. Otherwise, the trust would incorporate only the property that is optioned for purchase and that does not include the property rights owned by the City.

The Tribe cites *Stand Tall on Principles v. Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772, 781 [1 Cal.Rptr.2d 107] (*Stand Tall*), where this court held that the selection of a site for a new high school was not an approval of a project because the selection was "expressly made contingent on CEQA compliance." We said that the site selection phase was not the appropriate time for a CEQA analysis because the purchase of the site was contingent on the preparation of an EIR (environmental impact report), which necessarily would assess all reasonable alternative sites. (*Ibid.*) Thus, the site selection was only tentative and final approval was dependent upon compliance with CEQA.

In this case the vacating of the loop road is not dependent upon compliance with CEQA and the approval is assumed with the loop road provisions of the

MSA. The context of the agreement to vacate the loop road is sufficiently different from the site selection in *Stand Tall*, to distinguish the two cases. In *Stand Tall*, none of the parties questioned the necessity of preparing a CEQA EIR, only at what point in the site selection process an EIR was required. (*Stand Tall, supra,* 235 Cal.App.3d at pp. 776, 778, fn. 1.)

In this case there is no express recognition in the MSA that an EIR will be required before the loop road can be vacated. This is not simply a matter of analyzing the desirability of alternate sites. The economic incentives of the MSA are significant enough that delaying environmental review of the road vacation may well result in the justification of a decision already made. The Tribe has agreed to pay the City millions of dollars. Some has already been paid, some will be paid when construction commences, and some will be paid when the Gaming Development opens. By waiting to do environmental review until after the MSA provisions are implemented, the City runs the risk of succumbing to a financial momentum that provides a strong incentive to ignore environmental concerns, which could be more easily dealt with at this early stage of the process. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 395.)

Moreover, the question here is whether the City will endorse the taking of the lands into trust and the Gaming Development after considering and making public the environmental consequences of the vacation of the loop road and the other provisions of the City project. An assumption that the project will go forward notwithstanding its environmental consequences violates the principle that an EIR not be used to justify a decision already made.

The Tribe argues the road vacation provision is not a project for purposes of CEQA because it did not commit the City to a definite course of action, only to a process that may or may not end in the vacation of the road and that the Tribe could initiate the vacation process by requesting a hearing.

The point of the road vacation provision is to require the City not only to begin the process but to complete it in time for its inclusion in the trust on the lands through which the road runs. It provides: the "City shall commence and diligently pursue proceedings in order that the City *shall vacate* its rights to that portion of the loop road to the hotel that will be included in the Trust Lands simultaneously with the time the land is taken into trust." (Italics added.) This is an exception to the provision that excludes from the trust lands "existing City rights-of-way."

 The authority to vacate a street rests with the city legislative body and may occur only after a hearing is held and evidence presented to the city

council and a resolution of vacation adopted. (Sts. & Hy. Code, §§ 8312, 8320–8325; *City of Los Angeles v. Fiske* (1953) 117 Cal.App.2d 167, 172 [255 P.2d 445] ["The power to vacate a city street is vested solely in the municipality. The act of vacating can be done only upon a finding that the property in question is unnecessary for present or future uses as a street"].)

The Tribe's argument is a perversion of the holding in *Kaufman & Broad*, cited by the Tribe, which held that the creation of a CFD, which had no direct environmental consequences, was not a project where it was not an essential step in a chain of events leading to an ultimate environmental impact. (*Kaufman & Broad, supra*, 9 Cal.App.4th at p. 474.)

Here, the vacation of a road to the casino hotel has a direct physical impact on the City in increased traffic and there is no need to question whether the action taken is an essential step in a chain of events. The fact that the action could be initiated in another fashion is of no relevance.

The MSA recognizes there will be traffic impacts caused by the Gaming Development, necessarily including those caused by providing access to the casino hotel by means of the vacated portion of the loop road. Since the vacation of the City's authority over the loop road will be a cause of the environmental impacts occasioned by its use to carry the substantial traffic to a large casino hotel, such impacts are the proper subject of a CEQA analysis.

### C. *Fire Station*

The MSA outlined the following "general parameters" regarding fire protection and emergency medical response services for the Gaming Development. The Tribe agreed to pay $770,000 to remodel the existing fire station to address fire and emergency response needs on the trust lands. The City agreed to complete the remodel and have the station fully operational by the time the Gaming Development is open to the public. The Tribe also agreed to pay $230,000 for the purchase of a new pumper truck and $638,000 annually for personnel to staff the fire station around the clock. The Tribe agreed to pay the annual sum of $100,000 for equipment, maintenance and apparatus.

The Tribe asserts three reasons the fire and emergency services provisions of the MSA do not trigger CEQA review. First, the MSA did not cause the need for fire services because the Gaming Development can be developed without the MSA. Second, the MSA provides only "general parameters" which terms could be changed. Third, the fire station remodel would be exempt from CEQA.

Citing *Kaufman & Broad*, the Tribe argues the MSA is merely a funding mechanism for services, and does not cause the need for fire services.

It is difficult to see how the MSA could not cause the need for the fire station to be rebuilt, when the MSA specifically obligates the City to remodel its fire station to support a full-time staff. *Kaufman & Broad* is distinguishable because that case involved the formation by the public entity of a CFD, an action that made no direct physical change to the environment, and made no reasonably foreseeable indirect physical changes because the CFD did not create the need for development, and development was not entirely dependent on the creation of the CFD. (*Kaufman & Broad, supra,* 9 Cal.App.4th at p. 474.)

Here, by contrast, the MSA obligates the City to remodel its fire station to support an around-the-clock staff of fire and emergency services personnel. This is an activity directly undertaken by the City, which has the potential for resulting in direct physical change in the environment. (§ 21065, subd. (a); Guidelines § 15378, subd. (a).) The City's decision to undertake such action necessitates environmental review.

The Tribe argues the MSA merely provides the "general parameters" of an agreement, and does not entail a firm commitment. The implication is that the agreement to rebuild the fire station is not a project if the parties can negotiate different terms. The Tribe claims *City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677 [74 Cal.Rptr.2d 497] (*City of Vernon*), held there was no approval of a project where the project could be amended.

Such was not the holding of *City of Vernon.* The claim in that case was the EIR certified for a marine terminal project was a post hoc rationalization of a prior approval of the project. (*City of Vernon, supra,* 63 Cal.App.4th at pp. 681, 688–689.) The argument was that because the military base reuse plan, of which the marine terminal project was a part, could not be changed, the board of harbor commissioners approving the terminal project was legally bound to approve it when the reuse plan was approved by the city council and the federal Department of Defense. (*Id.* at pp. 683–684, 688–689.) The court stated that no authority had been cited prohibiting changes in the reuse plan if required to mitigate environmental measures. (*Id.* at p. 689.) The court did not hold that approval of the terminal project was not a project for purposes of CEQA because it could be amended. Since an EIR was prepared, there was no question but that the terminal project was a "project" for CEQA purposes.

Finally, the Tribe asserts the remodel of the fire station would be exempt from CEQA pursuant to Guidelines section 15301, subdivision (e), which exempts, "[a]dditions to existing structures provided that the addition will not result in an increase of more than: [¶] (1) 50 percent of the floor area of the structures before the addition, or 2,500 square feet, whichever is less; or [¶]

(2) 10,000 square feet if: [¶] (A) The project is in an area where all public services and facilities are available to allow for maximum development permissible in the General Plan and [¶] (B) The area in which the project is located is not environmentally sensitive." The Tribe asserts the remodel would be less than 10,000 square feet, and would be within a fully developed area that is not environmentally sensitive. However, the record does not contain a plan for the fire station remodel or a finding that it is not located in an environmentally sensitive area.[17] Absent evidence in the record that the remodel required by the MSA would be subject to an exemption, we cannot conclude it would be exempt.

The terms of the MSA requiring the City to remodel the fire station committed the City to directly undertake an activity that may cause a physical change in the environment. It therefore qualified as a project for purposes of CEQA.

D. *Water and Sewer Services*

The City has committed to the provision of water and sewer services to the Gaming Development and to the installation of the necessary infrastructure in several provisions of the MSA.[18]

---

[17] The administrative record contains a proposal to remodel the fire station, but it appears to have been prepared prior to the spring of 1998. There is no indication in the record why the plan was prepared, or that the plan is the one for remodeling the fire station pursuant to the MSA.

[18] The MSA states in part:

"8. Tribal Water and Sewer Systems. Upon the land going into trust, the Tribe shall provide its own water and sewer collection system to the Gaming Facility except that the City shall provide to the Trust Lands the water and sewer collection services to the extent that the City provides or has committed to provide municipal water and sewer collection to these lands prior to the lands being taken into trust by the Secretary of the Interior. The Tribe shall provide the funds identified in Paragraphs 9 and 10 as connection fees only if the City is willing and able to provide the municipal water and sewer disposal service sufficient to meet the needs of the Project, except that the Tribe shall pay the Five Hundred Thousand Dollars ($500,000) O&M costs described in Paragraphs 9 and 10. When the Tribe provides the connection fees described in Paragraphs 9 and 10, the City shall be obligated to provide water and sewer disposal service to the Project. . . .

"9. Sewer Disposal Service. The Tribe and the City agree that the Tribe shall provide for sewage disposal for the Project by connection to the City's existing sewer collection system. The City agrees to obtain easements, if required, for sewer infrastructure and construct any required connection to the City infrastructure standards. . . . Any approvals by the City required to implement this Section shall not unreasonably be withheld . . . .

"10. Potable Water Services. Subject to the provisions of Paragraph 8, the Tribe and the City agree that the Tribe shall obtain its water supply for the Trust Lands from the City municipal water system subject to the City obtaining an expansion of its water supply sufficient to meet the needs of the Project. After the land is placed into trust, to the extent that the City is willing and able to meet the water needs of the Project and all necessary permits and approvals have

Citing *Stand Tall*, the Tribe argues the water and sewer provisions of the MSA leave the City with complete discretion to refuse to provide services, thus there is no commitment to a definite course of action, and no approval of a project. The Tribe claims the "willing and able" language makes the agreement contingent on these future conditions, and such contingency prevents the MSA from committing the City to a definite course of action. We disagree.

Contrary to the Tribe's claims, the City's obligations with respect to sewer and water services are a commitment to a definite course of action.

The City agreed to provide sewage disposal for the Gaming Development by connection to the City's existing sewage collection system, to obtain necessary easements for sewer infrastructure, and to construct the required connections. Paragraph 8 of the MSA provides that "[w]hen the Tribe provides the connection fees described in Paragraphs 9 and 10, the City shall be obligated to provide water and sewer disposal service to the Project." Paragraph 9 of the MSA then provides that "[a]fter the land is placed into trust, the Tribe will pay the sum of [$1.675 million] as a one-time wastewater capital connection fee." Paragraph 10 of the MSA then provides that subject to paragraph 8 "the Tribe and the City agree that the Tribe shall obtain its water supply for the Trust Lands from the City municipal water system subject to the City obtaining an expansion of its water supply sufficient to meet the needs of the Project."

Paragraph 8 provides that the Tribe shall provide the "connection fees only if the City is willing and able to provide the municipal water and sewer disposal service sufficient to meet the needs of the Project." An exception clause then follows that the Tribe "shall pay" the operation and maintenance fees for the systems described in paragraphs 9 and 10 ($500,00 annually for each), implying that these fees are to be paid notwithstanding the "willing and able" clause, which is limited to the connection fees.

The MSA goes on to provide that after the land is placed in trust and "to the extent that the City is willing and able to meet the water needs of the Project and all necessary permits and approvals have been obtained, the Tribe will pay the sum of [$3 million] for a connection fee." With respect to both sewage and water the MSA provides that any "approvals by the City required to implement [these provisions] shall not unreasonably be withheld . . . ."

The City also agreed to provide the Gaming Development with a water supply "sufficient to meet the needs of the" Gaming Development subject to

been obtained, the Tribe shall pay the sum of Three Million Dollars ($3,000,000) for a connection fee. . . . Any approvals by the City required to implement this Section shall not be unreasonably withheld . . . ."

the City obtaining an expansion of its water supply. The Tribe agreed to pay $1.675 million as a one-time wastewater connection fee, $3 million as a water services connection fee, $500,000 annually for the operation and maintenance of the sewer collection system, and $500,000 annually for the operation and maintenance of the municipal water system. The Tribe agreed that payment of the "connection fees," as distinguished from the operation fees, is conditioned on whether "the City is willing and able to provide the municipal water and sewage disposal service sufficient to meet the needs of the Project . . . ." The City agreed it would not unreasonably withhold the approvals required to implement the sewage disposal and water supply provisions.

Although the MSA states in paragraph 8 that the Tribe need only pay the described "connection" fees if the City is "willing and able" to provide the water and sewer services for the Gaming Development, it declares in the next paragraph that the City agrees to connect the Gaming Development to its existing sewage systems, and in the following paragraph that the Tribe shall obtain its water supply from the City municipal water system. Thus, the City has already indicated its willingness to provide the services for the Gaming Development. Moreover, the MSA specifically provides that the City will not unreasonably withhold any approvals required to implement the water and sewer provisions, further indication the MSA represents a commitment by the City to a definite course of action. Finally, commitment to a definite course of action is indicated by the fact that the amounts the Tribe is agreeing to pay for connection fees is based on specific amounts of water and wastewater flow, a further indication of commitment to a definite course of action.

III

Exclusion for Government Funding Mechanism

Guidelines section 15378, subdivision (b)(4) excludes from the definition of a project, "[t]he creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment."

In *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594 [33 Cal.Rptr.3d 208] (*Rohnert Park*), cited by the Tribe, the court held that Rohnert Park's memorandum of understanding (MOU) with the Graton Rancheria Indian tribe was a mere funding mechanism that did not require compliance with CEQA. (131 Cal.App.4th at p. 1601.) The

Tribe argues that, like the MOU in *Rohnert Park*, the MSA here is not a project because it is a funding mechanism.

However, the MOU in *Rohnert Park*, differed from the MSA at issue in several important respects. The MOU was a "voluntary contractual arrangement" by which the Indian tribe agreed "to make contributions and community investments to mitigate impacts of the casino project." (*Worthington v. City Council of Rohnert Park* (2005) 130 Cal.App.4th 1132, 1138 [31 Cal.Rptr.3d 59].) The City of Rohnert Park agreed for its part not to oppose the acquisition of property for or development of the casino project. (*Id.* at p. 1139.) The MOU set no time for development and did not obligate the City of Rohnert Park to undertake any specified construction project. (*Rohnert Park, supra*, 131 Cal.App.4th at p. 1601.) The MOU specifically acknowledged that CEQA review might be required if the City of Rohnert Park provided infrastructure related to the casino project. (*Rohnert Park*, at p. 1601.)

By contrast, the MSA, in addition to requiring the nonopposition of the City to the trust lands and Gaming Development, required the City to remodel its fire station, the remodel to begin upon the commencement of construction of the gaming facility and to be completed by the time the Gaming Development is open to the public. The MSA required the City to construct any required connection to its existing sewer collection system, to install a backflow valve and sampling manhole with meter, and to obtain any required easements for sewer infrastructure. The MSA required the City to vacate a city road. The MSA did not specifically acknowledge that any of these actions, or any other actions taken by the City might require CEQA review. For these reasons, the MSA is unlike the mere funding agreement in *Rohnert Park*.

IV

Severance

The Tribe argues we are required to sever any provisions of the MSA that violate CEQA, leaving the remainder of the MSA enforceable.

The Tribe relies on section 21168.9, subdivision (b), which provides the court is to limit its CEQA order to "those specific project activities in noncompliance" with CEQA, but only if there is a finding that: (1) the specific project activity is severable, (2) severance will not prejudice full

compliance with CEQA, and (3) no finding has been made that the remainder of the project is noncompliant with CEQA.[19]

However, the trial court did not find the specific project activity was severable. It found that "the difficulties are so pervasive that the Court is unable to make the severable order." We agree with the trial court.

The project activity that did not comply with CEQA was the City's approval of the MSA without performing an initial study to determine whether to prepare a negative declaration or an EIR. The City's agreement "to support the Tribe's trust acquisition request" was conditioned on "the Tribe['s] ent[ry] into an enforceable MSA to *comprehensively* mitigate all impacts of the acquisition." (Italics added.) The severance of the municipal services and road vacation from the MSA would violate this central purpose of the agreement and would provide little benefit to the City.

This case is to be distinguished from those cited by the Tribe, where an EIR had been prepared, which failed to adequately address a specific project

---

[19] Section 21168.9 provides:

"(a) If a court finds, as a result of a trial, hearing, or remand from an appellate court, that any determination, finding, or decision of a public agency has been made without compliance with this division, the court shall enter an order that includes one or more of the following:

"(1) A mandate that the determination, finding, or decision be voided by the public agency, in whole or in part.

"(2) If the court finds that a specific project activity or activities will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project, a mandate that the public agency and any real parties in interest suspend any or all specific project activity or activities, pursuant to the determination, finding, or decision, that could result in an adverse change or alteration to the physical environment, until the public agency has taken any actions that may be necessary to bring the determination, finding, or decision into compliance with this division.

"(3) A mandate that the public agency take specific action as may be necessary to bring the determination, finding, or decision into compliance with this division.

"(b) Any order pursuant to subdivision (a) shall include only those mandates which are necessary to achieve compliance with this division and only those specific project activities in noncompliance with this division. The order shall be made by the issuance of a peremptory writ of mandate specifying what action by the public agency is necessary to comply with this division. However, the order shall be limited to that portion of a determination, finding, or decision or the specific project activity or activities found to be in noncompliance only if a court finds that (1) the portion or specific project activity or activities are severable, (2) severance will not prejudice complete and full compliance with this division, and (3) the court has not found the remainder of the project to be in noncompliance with this division. The trial court shall retain jurisdiction over the public agency's proceedings by way of a return to the peremptory writ until the court has determined that the public agency has complied with this division.

"(c) Nothing in this section authorizes a court to direct any public agency to exercise its discretion in any particular way. Except as expressly provided in this section, nothing in this section is intended to limit the equitable powers of the court."

activity (see *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1180 [30 Cal.Rptr.3d 738] [severance appropriate where only defect of EIR for a shopping center was its inadequate analysis of a gas station proposed to be included in the shopping center]), or where an EIR was inadequate as to its evaluation of future activities, but continuation of present activities was allowed pending a new EIR. (See *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 47 Cal.3d at p. 426; *City of Santee v. County of San Diego* (1989) 214 Cal.App.3d 1438, 1455–1456 [263 Cal.Rptr. 340].) Here, the City has not conducted an environmental review of the MSA at all; thus no issue of a defective EIR is tendered.

We also agree with the County that if we were to rewrite the parties' MSA for them to eliminate all of the provisions requiring CEQA compliance, the City would receive very little benefit from the agreement,[20] but would still be obligated to support the trust acquisition and Gaming Development. We refuse to rewrite the contract in this manner.

We disagree with the Tribe's assertion that the severance provisions of the MSA mandate severance in this situation. The MSA states, "[i]f for any reason any of the provisions of this MSA are found to be invalid or unenforceable by a court of last resort, then that provision shall be severed from this MSA and the remainder of the MSA shall remain in full force and effect." However, this severance provision is subject to the provisions of the Civil Code.

▮ Civil Code section 1608 provides that "[i]f any part of a single consideration for one or more objects, or of several considerations for a single object, is unlawful, the entire contract is void." This means that " 'if the consideration is single . . . its . . . illegality is fatal to the contract.' " (*Keene v. Harling* (1964) 61 Cal.2d 318, 324 [38 Cal.Rptr. 513, 392 P.2d 273], italics omitted.)

In this case the City's support for the Tribe's trust acquisition is the sole consideration for the Tribe's entering into the MSA, as provided on page 2 of the MSA. Since the support constitutes an approval of obligations under the MSA to engage in activities subject to CEQA without the prior consideration of their environmental impacts, the support is illegal and " 'is fatal to the contract.' " (*Keene v. Harling, supra,* 61 Cal.2d at p. 324.)

---

[20] The bulk of the money the Tribe would pay the City pursuant to the MSA is connected with services subject to CEQA.

## DISPOSITION

The judgment granting the petition for writ of mandate and enjoining the implementation of the MSA is affirmed. The County shall recover its costs on appeal for the Tribe. (Cal. Rules of Court, rule 8.276(a)(1).)

Sims, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied May 10, 2007, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied July 11, 2007, S153000.