[No. A123859. First Dist., Div. One. Feb. 24, 2010.]

PARCHESTER VILLAGE NEIGHBORHOOD COUNCIL et al., Plaintiffs and Respondents, v.
CITY OF RICHMOND et al., Defendants and Appellants.

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

COUNSEL

Orrick, Herrington & Sutcliffe, George A. Yuhas and Sarah C. Marriott for Defendants and Appellants.

Law Offices of Stephan C. Volker, Stephan C. Volker, Joshua A. H. Harris and Bridget A. Roberts for Plaintiffs and Respondents.

OPINION

**DONDERO, J.**—Defendants the City of Richmond and the City Council of the City of Richmond (City) appeal the judgment granting a peremptory writ of mandate invalidating a municipal services agreement (MSA) entered into by the City and the Scotts Valley Band of Pomo Indians of California (Tribe). The trial court concluded the City violated the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA) when it approved the MSA.[1] We reverse.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The Tribe is a federally recognized Indian tribe whose status was terminated in 1965 and restored by the Secretary of the Interior (Secretary) in 1992. As a result of the 1965 termination, the Tribe was divested of its tribal lands. In January 2005, the Tribe submitted an application requesting the Secretary acquire 29.87 acres in unincorporated west Contra Costa County in trust for the benefit of the Tribe.[2] The proposed site is adjacent to the City of Richmond. The Tribe plans to use the site to develop, construct and operate a class III gaming facility, consisting of a 225,000-square-foot structure that would house, among other things, 2,000 gaming machines and 50 gaming tables.[3]

In February 2006, the Tribe released a draft environmental impact statement (DEIS) prepared pursuant to the federal National Environmental Policy Act of 1969 (42 U.S.C. § 4321 et seq.).

On April 17, 2006, representatives from the City met with the Tribe to begin discussions on entering into an agreement regarding the provision of municipal services to the Tribe.

---

[1] All subsequent statutory references are to the Public Resources Code except as otherwise indicated.

[2] The Secretary of the Interior is authorized to acquire lands in trust "for the purpose of providing land for Indians." (25 U.S.C. § 465.)

[3] The casino facility would be authorized pursuant to the terms and provisions of the Indian Gaming Regulatory Act. (25 U.S.C. § 2701 et seq.; IGRA.)

On April 28, 2006, the City submitted comments regarding the DEIS to the United States Department of the Interior's Bureau of Indian Affairs (BIA).

On May 10, 2006, the City and the Tribe formally entered into an agreement to negotiate the MSA.

On September 27, 2006, the Tribe responded to the City's comments on the DEIS.

On November 14, 2006, City staff submitted a report to the city council outlining key provisions of the proposed MSA. In the report, staff noted that it was unknown whether the federal government would approve the Tribe's application to acquire the proposed casino site. The impact that a state tribal compact would have on the Tribe's obligations regarding the casino was also unknown.[4] If approved, staff predicted the casino would "have a tremendous impact on the surrounding residents and business." As the City would not have any say over the federal or state decisions concerning the Tribe's casino, staff recommended that the City proceed with the MSA to secure funding in order to mitigate the casino's direct impact, as well as to improve services throughout the City to mitigate indirect impacts. Staff cautioned that if an MSA was not approved, the City's opportunity to influence the casino project and receive mitigation in the future could be "severely limited."

On November 21, 2006, the city council voted to approve the MSA. The approval resolution includes a statement that the federal, state, and City actions associated with the casino are not "projects" of the City within the meaning of CEQA.

On December 27, 2006, the City and the Tribe executed the MSA. The MSA provides that the City will receive, in exchange for the provision of specified City services: (1) a nonrecurring payment of $8,234,500, $7.1 million of which is earmarked for fire protection and the remainder of which is earmarked for police and public works, (2) an annual contribution of $6 million in years one and two, $8 million in years three and four, $9 million in years five and six, and $9 million adjusted annually by the consumer price index (CPI) in years seven to 20, and (3) an annual payment of $7,459,700,

---

[4] Class III gaming activities are lawful on Indian lands only if the activities are "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State . . . ." (25 U.S.C. § 2710(d)(1)(C).) Article IV, section 19, subdivision (f) of the California Constitution provides, in part: "Notwithstanding . . . any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law."

adjusted annually by the CPI, for the 20-year term of the MSA, intended to fund salaries for new police, fire, and public works personnel and equipment. The City also agreed to support the Tribe's fee-to-trust application. The City disavowed any commitment to make physical changes to the environment as a result of the agreement, but indicated an intent to comply with CEQA in the future if necessary.

On July 26, 2007, the Parchester Village Neighborhood Council, the Citizens of East Shore Parks, Sustainability, Parks, Recycling and Wildlife Defense Fund, and Whitney Dotson (plaintiffs) filed a petition for writ of mandate and a complaint for declaratory and injunctive relief against the City. Plaintiffs contended the MSA was unlawful because the City was required to conduct an environmental review under CEQA before entering into the agreement. They claimed the City "violated CEQA by improperly determining that their approval of the MSA did not constitute the approval of a project subject to CEQA and that their actions were exempt from CEQA."

On September 2, 2008, the trial court issued a final ruling adopting its tentative ruling in favor of plaintiffs.

On November 7, 2008, the trial court filed its judgment for plaintiffs.

On November 14, 2008, the trial court filed its peremptory writ of mandate, requiring the City to set aside its approval of the MSA. This appeal followed.

## DISCUSSION

I. *Standard of Review*

A claim that an agency approved a project with potentially significant environmental effects before preparing and considering an environmental impact report (EIR) is an issue concerning procedural error that is to be decided by the courts independently. (*Save Tara v. City of West Hollywood* (2008) 45 Cal.4th 116, 131 & fn. 10 [84 Cal.Rptr.3d 614, 194 P.3d 344] (*Save Tara*).)

II. *CEQA*

■ "CEQA is a comprehensive scheme designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112 [65 Cal.Rptr.2d 580, 939 P.2d 1280].) In general, "CEQA compels government first to identify the environmental effects of projects, and then to mitigate those adverse effects through the

imposition of feasible mitigation measures or through the selection of feasible alternatives. It permits government agencies to approve projects that have an environmentally deleterious effect, but also requires them to justify those choices in light of specific social or economic conditions." (*Sierra Club v. State Bd. of Forestry* (1994) 7 Cal.4th 1215, 1233 [32 Cal.Rptr.2d 19, 876 P.2d 505].)

Under CEQA, local agencies such as the City are required to "prepare . . . an [EIR] on any project that they intend to carry out or approve which may have a significant effect on the environment."[5] (§ 21151.) "The Legislature has made clear that an EIR is 'an informational document' and that '[t]he purpose of an environmental impact report is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391 [253 Cal.Rptr. 426, 764 P.2d 278].) "However, an agency has no duty of compliance with CEQA unless its actions will constitute (1) 'approval' (2) of a 'project.' [Citation.]" (*Concerned McCloud Citizens v. McCloud Community Services Dist.* (2007) 147 Cal.App.4th 181, 191 [54 Cal.Rptr.3d 1] (*McCloud*).)

CEQA applies only to "discretionary projects proposed to be carried out or approved by public agencies . . . ." (§ 21080, subd. (a).) A " '[p]roject' " subject to CEQA is defined as "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is any of the following: [¶] (a) An activity directly undertaken by any public agency. [¶] (b) An activity undertaken by a person which is supported, in whole or in part, through contracts, grants, subsidies, loans, or other forms of assistance from one or more public agencies. [¶] (c) An activity that involves the issuance to a person of a lease, permit, license, certificate, or other entitlement for use by one or more public agencies." (§ 21065.)

III. *The Trial Court's Ruling*

The trial court found that, for purposes of plaintiffs' petition, the City's "endorsement and construction commitments specified in [the] MSA" constituted a "project" within the meaning of section 21065 because they amounted to "an activity directly undertaken" by the City with the " 'potential for

---

[5] " 'Environment' " is defined as "the physical conditions which exist within the area which will be affected by a proposed project, including land, air, water, minerals, flora, fauna, noise, [and] objects of historic or aesthetic significance." (§ 21060.5.)

resulting in either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment.' ([Cal. Code Regs., tit. 14, § 15378, subd. (a)].)" The court found that while the MSA "has an emphasis on funding mechanisms" it also commits the City "to a range of fire improvements," along with various traffic improvements and a bicycle lane. The court also found it significant that the MSA includes "an official endorsement of the Tribe's fee-to-trust application."

The City claims its decision to enter into the MSA was not an "approval" of a "project" under CEQA. It contends the MSA merely concerns the funding of hypothetical improvements that will be carried out only if certain preconditions are satisfied.

## IV.  Is the Tribe's Casino a CEQA "Project" of the City?

We first address plaintiffs' repeated claims that the Tribe's casino is itself a "project" that triggers the City's obligation to comply with CEQA. They contend that "Because the casino is the 'activity' for which all these approvals are made, and the casino is clearly a 'definite course of action' that will change the physical environment, the MSA triggered CEQA." They assert the City qualifies as both a "responsible" agency,[6] and a "lead" agency[7] with respect to the casino project. The City counters that it had no regulatory authority over the casino and therefore the casino is not a "project" of the City within the meaning of CEQA. We find the City's position to be persuasive.

As noted above, section 21065 defines "project" to include "an activity which may cause either a direct physical change in the environment, or a reasonably foreseeable indirect physical change in the environment, and which is . . . [¶] . . . [a]n activity *directly undertaken* by any public agency." (*Id.*, subd. (a), italics added.) The CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.)[8] describe an "activity directly undertaken by any public agency" to include "public works construction and related activities clearing or grading of land, improvements to existing public structures, enactment and amendment of zoning ordinances, and the adoption and amendment of local General Plans or elements thereof . . . ."[9] (Guidelines, § 15378, subd. (a).)

---

[6] See California Code of Regulations, title 14, section 15096.

[7] See section 21100, subdivision (a).

[8] All further citations to title 14, section 15000 et seq. of the California Code of Regulations will be referred to as Guidelines.

[9] "The term 'CEQA Guidelines' refers to the regulations for the implementation of CEQA authorized by the Legislature [citation], codified in title 14, section 15000 et seq. of the California Code of Regulations, and 'prescribed by the Secretary for Resources to be followed by all state and local agencies in California in the implementation of [CEQA].' [Citation.] In

The Guidelines further provide that "approval," with respect to private projects, "occurs upon the earliest commitment to issue or the issuance by the public agency of a discretionary contract, grant, subsidy, loan, or other form of financial assistance, lease, permit, license, certificate, or other entitlement for use of the project." (Guidelines, § 15352, subd. (b).) The Guidelines must be read in the context of 21151, which provides that local agencies "shall prepare . . . an environmental impact report on any project *that they intend to carry out or approve* which may have a significant effect on the environment." (Italics added.)

■ In our view, the Tribe's casino development does not constitute a "project" of the City under CEQA because the City has no legal authority over the property upon which the casino will be situated. While the MSA does indicate that the City agreed to support the Tribe's efforts to acquire the land and to obtain the requisite approvals from the BIA and the Governor, this expression of support does not transform the casino into a "project" so as to trigger the City's preparation of an EIR.

■ First, an agency does not commit itself to a project "simply by being a proponent or advocate of the project . . . ." (*City of Vernon v. Board of Harbor Comrs.* (1998) 63 Cal.App.4th 677, 688 [74 Cal.Rptr.2d 497], disapproved on other grounds in *Save Tara, supra,* 45 Cal.4th 116, 131, fn. 10.) " 'If having high esteem for a project before preparing an environmental impact report (EIR) nullifies the process, few public projects would withstand judicial scrutiny, since it is inevitable that the agency proposing a project will be favorably disposed to it.' [Citation.]" (*Save Tara, supra,* at pp. 136–137.) Second, the proposed casino will be built on a site that is entirely outside the City's boundaries. Therefore the City has no legal jurisdiction over the property. Should the City change its mind and decide to "disapprove" of the project, its decision would not be binding on the BIA or the Governor.

Plaintiffs claim the City has "substantial influence" over the federal government's decision to grant the Tribe's fee-to-trust application because, under the IGRA, title 25 United States Code section 2719(b)(1)(A), the City's opinion on the matter "must" be considered.[10] The referenced statute requires

interpreting CEQA, we accord the CEQA Guidelines great weight except where they are clearly unauthorized or erroneous." (*Muzzy Ranch Co. v. Solano County Airport Land Use Com.* (2007) 41 Cal.4th 372, 380, fn. 2 [60 Cal.Rptr.3d 247, 160 P.3d 116].)

[10] Title 25 United States Code section 2719(b)(1)(A) provides that gaming can be conducted on land that is acquired in trust by the Secretary after 1988 if "the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination . . . ."

the Secretary to consult with "appropriate" local officials before approving an application. As the City notes, however, the provision under which the Tribe sought the casino site (25 U.S.C. § 2719(b)(1)(B)(iii)) does not require local government approval or support.[11] While plaintiffs assert the City "exercised considerable control over the casino project's size, timing and impacts," they do not cite to anything in the record to support their assertion that the MSA "represents the City's pivotal go/no-go approval of this project," or that its refusal to support the Tribe could have prevented the casino from being constructed.

Additionally, the case that plaintiffs rely on, *County of Amador v. City of Plymouth* (2007) 149 Cal.App.4th 1089 [57 Cal.Rptr.3d 704] (*Amador*), actually undermines their position. In *Amador*, the appellate court found the acquisition of trust lands for a casino development was not the "project" of the City of Plymouth within the meaning of CEQA precisely because "neither the taking of lands in trust nor the [casino development] requires the formal approval of the City . . . ." (*Amador, supra*, at p. 1094.) Instead, the municipal services agreement involved in that case was deemed to be subject to CEQA because it unconditionally obligated the city to vacate a portion of a city road and to remodel the city's existing fire station. The agreement also conditionally obligated the city to construct connections to the casino's sewer and water systems and to increase system capacity to meet the needs of the casino development. (*Amador, supra*, at p. 1094.) The appellate court "made clear" that the project for purposes of CEQA consisted "of the things which the MSA commits the City to construct." (*Amador, supra*, at p. 1097, fn. 6.) Further, the court affirmed the CEQA "project" was *not* the casino itself, "for the approval of that project, with the exception of the state's role in authorizing gambling pursuant to a compact, is confined to the federal government." (*Amador, supra*, at p. 1104.) In sum, the casino project is not a "project" of the City within the meaning of CEQA.

## V. *Is the MSA's Support of the Tribe's Fee-to-trust Application a CEQA "Project"?*

Plaintiffs claim the MSA's support of the Tribe's fee-to-trust application to the BIA constitutes a project requiring CEQA review. We have already held that the Tribe's casino is not a "project" of the City for the purposes of CEQA. Accordingly, it follows that the City's endorsement of the Tribe's fee-to-trust application is also not the City's "project."

---

[11] Title 25 United States Code section 2719(b)(1)(B)(iii) provides that gaming may be conducted on land taken into trust by the Secretary after 1988 if the land is taken as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."

Again, plaintiffs' reliance on *Amador* is misplaced. In *Amador*, the city had sent a letter to the Secretary in support of the tribe's application to place the land in trust. The letter was incorporated into the MSA. (*Amador, supra*, 149 Cal.App.4th 1089, 1094.) While the appellate court stated "it is unrealistic to assert that the City's support [of the tribe's application] has no consequences for the process being pursued by the Tribe" (*id.* at p. 1105), the court did not hold that the expression of support, standing alone, was a "project" for CEQA purposes. Further, in discussing why it would not sever the letter of support from the municipal services agreement, the court did not hold the letter was invalid because it was a project. Rather, the court held that the city's letter of support constituted "the sole consideration for the Tribe's entering into the MSA" and that this support thus was "an approval of obligations under the MSA to engage in activities" in violation of CEQA, rendering the letter void and the entire contract a nullity. (*Amador, supra*, at p. 1114.)

## VI. *Is the MSA a Funding Mechanism?*

The City asserts that CEQA does not apply to agency actions that "simply provide a mechanism for funding possible improvements and do not commit the public agency to approve any specific project." The City further notes the MSA does not ignore the possibility that CEQA may apply in the future should any improvements be implemented because the agreement provides: "If and to the extent the City hereafter determines that it is required to comply with CEQA with respect to any activities undertaken to fulfill its obligations under this Agreement, the City shall comply with CEQA at such time." Plaintiffs argue that the MSA, while including provisions related to funding, also sets forth "substantive duties that commit both the Tribe and the City to approve and construct numerous improvements and provide related services," thereby triggering CEQA review.

In *Save Tara*, the Supreme Court addressed the proper application of CEQA in the context of a public agency's approval of a contract relating to a proposed development. In that case, the City of West Hollywood had agreed to allow a private developer to redevelop property for senior housing. The agreement was conditioned on future compliance with CEQA. (*Save Tara, supra*, 45 Cal.4th 116, 125–126.) The court concluded that, because the city had already committed itself to the project, it was required to prepare and consider an EIR before entering into the agreement. (*Id.* at pp. 142–143.) In reaching this conclusion, the court considered the following factors. First, the city "agreed to initially lend the developer nearly half a million dollars, a promise *not* conditioned on CEQA compliance" and if the city "did not give final approval to the project, . . . it would not be repaid." (*Id.* at p. 140.) Second, the agreement provided that "whether CEQA requirements had

been met was to be 'reasonably determined by the City Manager,' language that could have left [the city] open to charges it acted unreasonably, had it ultimately declined to certify the EIR or make any needed CEQA findings." (*Ibid.*) Third, the agreement "had no provision for appealing to the city council the city manager's decision on, or waiver of, CEQA compliance." (*Id.* at p. 141.) Fourth, the agreement "arguably left open the question whether [the city] remained free to find that the EIR was legally adequate and yet to reject the project on substantive environmental grounds." (*Id.* at p. 140.) Fifth, the city made "public announcements that it was determined to proceed with the development" of the project. (*Id.* at p. 142.) Sixth, the city "proceeded with tenant relocation on the assumption the property would be redeveloped as in the proposed project." (*Ibid.*) These factors tended "strongly to show that [the city's] commitment to the . . . project was not contingent on review of an EIR." (*Ibid.*)

Unlike the municipality in *Save Tara*, it appears to us that the City did not unconditionally commit itself to making any of the physical changes referenced in the MSA. We thus agree with the City's contention that the MSA is best understood as a mechanism for funding proposed projects that may be modified or not implemented at all depending upon a number of factors, including CEQA environmental review. (Guidelines, § 15378, subd. (b)(4).)[12]

We addressed a situation similar to the present one in *Citizens to Enforce CEQA v. City of Rohnert Park* (2005) 131 Cal.App.4th 1594 [33 Cal.Rptr.3d 208] (*Rohnert Park*). In that case, a city had entered into a memorandum of understanding (MOU) with an Indian tribe regarding a gambling casino the tribe proposed to construct outside the city limits. (*Id.* at pp. 1597–1598.) The MOU was "an agreement to establish a source of funds for potential future improvements if the casino project takes place." (*Id.* at p. 1601.) The MOU also addressed "the ways in which the Tribe agree[d] to mitigate potential impacts of its casino project." (*Id.* at p. 1600.) Noting that the MOU acknowledged CEQA review could be required if the city were to provide infrastructure for the casino, we held the city's entry into the MOU was not a "project" because the agreement merely authorized a funding mechanism. (*Rohnert Park, supra*, at p. 1601.)

In *Rohnert Park*, we cited to *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464 [11 Cal.Rptr.2d 792] (*Kaufman & Broad*), wherein the appellate court "held that a school district's resolution to establish a community facilities district (CFD 1) to raise funds,

---

[12] Guidelines section 15378, subdivision (b)(4), provides that a "project" does not include "The creation of government funding mechanisms or other government fiscal activities, which do not involve any commitment to any specific project which may result in a potentially significant physical impact on the environment."

'to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities' was not a 'project' for purposes of CEQA compliance. [Citation.]" (*Rohnert Park, supra,* 131 Cal.App.4th 1594, 1601.) The court in *Kaufman & Broad* explained: "The only foreseeable impact from formation of CFD 1 is that when the District does determine sometime in the future to acquire sites for the construction of schools, to lease or purchase portable classrooms and buses, and to rehabilitate future facilities it will have some of the funds necessary to do so. When it makes those decisions, which depend in large part on the pattern of development within the District, it will have to examine the environmental impacts. Here the District's resolution forming CFD 1 is not 'an essential step culminating in action which may affect the environment.' [Citation.]" (*Kaufman & Broad, supra,* at p. 474.)

We found the MOU in *Rohnert Park* to be similar to the funding mechanism addressed by the appellate court in *Kaufman & Broad*: "It sets no time for development and does not obligate the City to undertake a specified construction project. Rather, it is an agreement to establish a source of funds for potential future improvements if the casino project takes place. The MOU specifically acknowledges that CEQA review and compliance may be required if the City ever provides infrastructure related to the casino project. Mere authorization of the funding mechanism set out in the MOU is not a 'project' for purposes of CEQA." (*Rohnert Park, supra,* 131 Cal.App.4th 1594, 1601.)

Plaintiffs claim that the MSA is not merely a funding mechanism because it commits the City to support the Tribe's applications to the Governor and the BIA, as well as to the construction of "substantial physical improvements and services." While plaintiffs concede that "the specific location and timing of some of these improvements and services will be identified more specifically in the future," they argue that the City "has definitely committed to support the casino project and assume responsibility for providing extensive supportive facilities and services by entering into the MSA." Plaintiffs seek to distinguish *Rohnert Park* and *Kaufman & Broad,* arguing that the agreements at issue in those cases "*only* committed the government agencies to financial arrangements, and were therefore construed by the courts as mere funding mechanisms that are not subject to CEQA." They claim the MSA "includes substantive duties that commit both the Tribe and the City to approve and construct numerous improvements and provide related services . . . ." We are not persuaded.

The MSA at issue in the present case is similar to the *Rohnert Park* MOU. Both agreements set no timeline for the construction of physical improvements and do not obligate the City to undertake any specified construction

project. (*Rohnert Park, supra*, 131 Cal.App.4th 1594, 1601.) Similarly both documents specifically acknowledge that CEQA review might be required if the municipality ultimately provides infrastructure related to the casino projects. (*Rohnert Park, supra*, at p. 1601.) While an agreement's conditioning of initial approval on CEQA compliance is not determinative with respect to the timing of CEQA review, it is relevant.

██ In *Save Tara*, our Supreme Court considered the impact of a similar CEQA compliance condition in an agency's agreement allowing private development. The court concluded that the agreement's "conditioning of final approval on CEQA compliance is relevant but not determinative" in deciding whether a public agency has committed itself to, and therefore approved, a project. (*Save Tara, supra*, 45 Cal.4th 116, 139.) Such a condition "can be a legitimate ingredient in a preliminary public-private agreement for exploration of a proposed project, but if the agreement, viewed in light of all the surrounding circumstances, commits the public agency as a practical matter to the project, the simple insertion of a CEQA compliance condition will not save the agreement from being considered an approval requiring prior environmental review." (*Id.* at p. 132.) The court applied "the general principle that before conducting CEQA review, agencies must not 'take any action' that significantly furthers a project 'in a manner that forecloses alternatives or mitigation measures that would ordinarily be part of CEQA review of that public project.' [Citations.]" (*Id.* at p. 138.) In the present case, we conclude the MSA's CEQA compliance condition is a "legitimate ingredient" of the parties' agreement.

The MSA is also distinguishable from the agreement that was invalidated in *Amador*. In *Amador*, the municipal services agreement *required* the City to remodel its fire station, to construct any required connection to its existing sewer collection system, to install a backflow valve and sampling manhole with meter, to obtain any required easements for sewer infrastructure, and to vacate a city road. Further, "The MSA did not specifically acknowledge that any of these actions, or any other actions taken by the City might require CEQA review." (*Amador, supra*, 149 Cal.App.4th 1089, 1112.) For these reasons, the appellate court deemed the agreement "unlike the mere funding agreement in *Rohnert Park*." (*Ibid.*)

The present case also contrasts with *Citizens for Responsible Government v. City of Albany* (1997) 56 Cal.App.4th 1199 [66 Cal.Rptr.2d 102] (*Albany*), relied on by plaintiffs. In *Albany*, the city council negotiated an agreement allowing a developer to add a cardroom gaming facility to its existing horse racing track operation. (*Id.* at pp. 1205–1206.) The city council then passed several resolutions ordering the development agreement, among other items, be placed on the ballot as "Measure F" for the general election. (*Albany*,

*supra*, at p. 1206.) The voters passed Measure F by a narrow margin and a legal challenge followed, in part based on CEQA. (*Albany, supra*, at p. 1206.) Because the development agreement gave the developer a vested right to complete its gaming facility within certain clear and narrowly defined parameters, the appellate court concluded the agreement qualified as a "project" subject to the provisions of CEQA. (*Albany, supra*, at p. 1215.) The court rejected the city's contention that prior CEQA review was not required because the agreement contained terms contemplating subsequent environmental review and the incorporation of " 'reasonably' feasible mitigation measures." (*Albany, supra*, at pp. 1219–1220.) First, the agreement's procedures and standards for analyzing and identifying impacts and mitigation measures were inconsistent with CEQA, which requires analysis of environmental concerns before approval of a project. (*Albany, supra*, at pp. 1219–1221.) Second, by entering into the agreement, the city had contracted away its authority to consider a full range of mitigation measures. (*Id.* at pp. 1221–1222.) Finally, the development agreement precluded consideration of the "no project" alternative, contrary to the requirement of CEQA.[13] (*Albany, supra*, at pp. 1222–1223.)

Here, we cannot conclude that the City, by entering into the MSA, has "contracted away its power to consider the full range of alternatives and mitigation measures required by CEQA" (*Albany, supra*, 56 Cal.App.4th 1199, 1221) or that it has precluded consideration of a "no project" option. (*Id.* at p. 1222.) As we discuss below, to the extent the MSA contemplates future physical changes to the environment, the changes are either not within the City's jurisdiction or are not ripe for CEQA review.

VII.   *Firehouse Improvements*

██    As the Supreme Court in *Save Tara* counseled, our task is to "look not only to the terms of the agreement but to the surrounding circumstances to determine whether, as a practical matter, the agency has committed itself to the project as a whole or to any particular features, so as to effectively preclude any alternatives or mitigation measures that CEQA would otherwise require to be considered, including the alternative of not going forward with the project." (*Save Tara, supra*, 45 Cal.4th 116, 139.) Here, the MSA requires the parties to negotiate a fire protection and emergency response agreement (FPERA) after the Tribe provides the City with its operational plan. As a part of the FPERA, the City is given the discretion to proceed with one of the following improvements: "1) the construction and operation of a fully equipped fire station . . . on a parcel of real property selected by the City within a radius of one and one-half miles from the [casino] Project,

---

[13] (See Guidelines, § 15126.6, subd. (e) ["no project" alternative to be considered along with proposed project's environmental impact].)

2) upgrades to one or more of the . . . current fire stations, or 3) the consolidation and relocation of existing fire stations to a location within a radius of one and one-half miles from the Project . . . ."

Plaintiffs claim the MSA's commitments governing firehouse improvements are subject to CEQA review because they are reasonably likely to create physical changes to the environment.[14] They claim the MSA sets a definite course of action because it commits the City to selecting one of the three options mentioned for fire improvements, thereby precluding consideration of the " 'no project' alternative." Relying on *Amador*, they claim the MSA does not allow the City to refuse to provide fire protection improvements "to serve the casino project." Plaintiffs also claim the casino project was "fully formulated" at the time the MSA was drafted and that the City did not lack any information needed to perform a CEQA review. The City claims that the MSA merely requires the City and the Tribe to negotiate firehouse improvements and their funding, without dictating which improvements will be adopted. The City asserts that the parameters of any improvements will remain unknown until the Tribe and the City negotiate that agreement as part of the FPERA, if and after the casino project is approved.

■ The Supreme Court clarified in *Save Tara* that "An agency cannot be deemed to have approved a project . . . unless the proposal before it is well enough defined 'to provide meaningful information for environmental assessment.' [Citation.]" (*Save Tara, supra*, 45 Cal.4th 116, 139.) Here, the MSA merely sets the stage for future negotiations to establish the FPERA. Additionally, the MSA specifically states: "Nothing in this Agreement shall be construed to constitute approval of development plans for a Station design, development, and construction of which shall conform to all applicable laws." The agreement does not specify a site for any of the proposed physical improvements described therein, beyond that they would occur within a certain radius of the casino. As a practical matter, we find it difficult to conceive of how an EIR could be used to sensibly evaluate a project that has not yet been assigned a physical location. As stated in *McCloud*: "At the current planning stage of this proposed project, preparation of an EIR would be premature. Any analysis of potential environmental impacts would be wholly speculative and essentially meaningless." (*McCloud, supra*, 147 Cal.App.4th 181, 197.) The three firehouse options at this point are simply too vague to trigger CEQA review.

---

[14] In their petition for rehearing, plaintiffs contend CEQA review is required because the City "committed in the MSA to the Station 68 expansion project." The record shows that the City agreed to make the following modification to Station 68, regardless of which fire protection option was ultimately chosen: "Addition of second restroom facility for female staff, additional sleeping quarters for 3 additional staff." There is nothing in the record to suggest that these changes to the station will require any physical expansion of the facility.

Plaintiffs claim the MSA effectively "paints the agency into a corner." We disagree. The obligations that the City undertook pursuant to the MSA, merely agreeing to set up the FPERA, are much less onerous than the obligations undertaken by the cities in *Save Tara* and *Amador*. Nor does it appear that the City is absolutely required to undertake any of the three firehouse options. Section 7.1(2) of the MSA expressly provides that nothing in the MSA constitutes any commitment by the City to develop, construct, or improve any facilities or to issue any permit or entitlement for use.

## VIII. *Transportation Improvements*

Section 2.6(b)(1) of the MSA provides: "Unless adequate mitigation can be achieved by the location of driveways or other design features of the Project as reasonably determined by the City, the Tribe shall, at its sole cost, add a left-turn lane on the west-bound Parr Blvd. approach to the Richmond Parkway, provide two west-bound through lanes between the main entrance to the Gaming Facility and Richmond Parkway shall widen Parr Blvd. to three lanes in the west-bound approach to the Richmond Parkway intersection, and make associated modifications to the traffic signal." The Tribe also agreed to provide shuttle bus service and paint bike path striping on one designated street. The Tribe further agreed to install a bike rack and build a sidewalk on a portion of its property.

Plaintiffs claim the MSA's commitments governing transportation improvements are subject to CEQA review. The City disagrees, noting that most of these improvements had already been arrived at as part of the federal DEIS process.

We first observe that only a minor portion of the traffic improvements specified in this provision are within the City's boundaries.[15] Further, as the City notes, most of these improvements were included in the DEIS that the Tribe prepared for the BIA. Thus, it is unclear to us that the City is the governmental entity that has "agreed" to allow the Tribe to construct these traffic improvements. Plaintiffs speculate that because some of the proposed improvements are adjacent to the City "it [the City] may in fact become the agency that will build or accept these improvements." Such speculation is insufficient evidence that the City itself is committed to going forward with the proposed traffic improvements or that it is the appropriate agency to conduct CEQA review.

As we have concluded the trial court erred in invalidating the MSA, we need not address the City's argument that the court should have allowed the City to modify the MSA to address the court's concerns.

---

[15] These traffic improvements consist solely of repaving two existing streets, a portion of which fall within the City's boundaries. Taken in isolation, it does not appear that the repaving of an existing paved street constitutes a "project" within the meaning of section 21065.

## DISPOSITION

The judgment granting plaintiffs' petition for writ of mandate and requiring the agreement between the City and the Tribe to be vacated, set aside, and voided is reversed. The matter is remanded to the trial court with directions to enter a new judgment denying plaintiffs' petition for writ of mandate.

Appellant will recover costs on appeal.

Marchiano, P. J., and Margulies, J., concurred.

A petition for a rehearing was denied March 25, 2010, and the opinion was modified to read as printed above. Respondents' petition for review by the Supreme Court was denied May 12, 2010, S181663.